## SHEPARD PLIMPTON & another *vs.* LYMAN PLIMPTON.

A devise to the testator's son, of "my dwelling-house, after my wife's decease, together with one acre and a half of land adjoining said house," gives a remainder in fee after the widow's death, even before Rev. Sts. c. 62, § 4; although the words heirs or assigns are not used.

A testator died in 1821, having devised his homestead to his widow for life, remainder over to D., without express words of perpetuity, and the rest and residue of his estate to Z. In 1843, Z. having obtained the widow's life-estate, conveyed the whole by a warranty deed to L., who went into possession. The widow died in 1846, and D. soon after. In a real action by the heirs of D., commenced August 1, 1851, it was held that D. took a remainder in fee under the will, and that L. was liable to the heirs of D. for the rents and profits after

the death of the widow, but that L. had a valid claim for improvements made by himself or his grantor Z., although in part made during the life of the widow.

WRIT OF ENTRY for a tract of land in Sharon, dated August 1, 1851. The parties agreed to a statement of facts, of which the following are the most material:

Ziba Plimpton, grandfather of the demandants, died seised of the premises in 1821. His will, dated May 22, 1821, was proved and allowed January 1, 1822, the important clauses of which were as follows:

" 1st. I give and bequeath unto my beloved wife, Tabitha Plimpton, all my household furniture, together with my clock, to be at her disposal; also, the improvement of my dwelling-house during her life. Also, to be provided and paid yearly by my executors hereinafter named, the following articles, viz: one cow, to be kept for her use, ten bushels of Indian corn, four bushels of rye, seventy pounds of beef, seventy pounds of pork, one hundred pounds of cheese, thirty pounds of butter, and eight pounds of wool; also, sauce, cider, and apples, what she naturally wants for her use, — and wood, cut at the door, sufficient for one fire, — and horse and chaise for her use when necessary, and ten dollars in money.

" Item. I give and bequeath unto my son, Daniel Plimpton, one cow, and one half of my wearing apparel. I also give him my dwelling-house, after my wife's decease, together with one acre and a half of land adjoining said house, bounds to be as follows: beginning at the road at the southeast corner of said house, running northwardly three rods from said house parallel with the house, thence westwardly two rods from said house parallel line with north side of said house, thence on the said westwardly line, then south to Foxborough line, then east to the first mentioned road to contain the said acre and an half.

" Also, the improvement of thirty-six acres of land lying in said Sharon, known by the name of the Elijah Morse place, be the same more or less. Also, the improvement of eleven acres of wood-land in said Sharon, known by the name of the Felch lot, be the same more or less; the said Daniel Plimpton

to improve the two last described lots of land during his life, then to be equally divided between his two sons, Shepard and Charles Plimpton.

"Item. I give and bequeath unto my daughter, Catharine Smith, the wife of James Smith, the sum of four hundred dollars, in addition to what she has already received, to be paid in three years after my decease, by my executors hereinafter named.

"Item. I give and bequeath unto my daughter, Polly Hewins, the wife of Joel Hewins, the sum of four hundred dollars, in addition to what she has already received, to be paid in two years after my decease, by my executor hereinafter named.

"Lastly. I give and bequeath unto my son, Ziba Plimpton, all the rest and residue of my estate, both real and personal, goods and chattels of whatsoever name or nature, or wheresoever it may be found that I may die possessed of, by his paying my just debts and funeral charges and the legacies hereinbefore named, whom I do appoint sole executor of this, my last will and testament, herein revoking all former wills by me made."

Tabitha Plimpton, the testator's widow, died ·March 15, 1846, and Daniel Plimpton, son of the testator, and father of the demandants, died intestate soon after. The tenant claims under an absolute warranty deed from his father, Ziba Plimpton, 2d, the other son and residuary legatee of the testator, made in 1843, said Ziba having at that time acquired all the rights of the widow Tabitha in said premises.

In case of judgment for the demandants, the tenant to have compensation for any buildings erected or improvements made on the premises, by himself or his father, Ziba Plimpton.

The case was argued at the November term, 1852.

*J. H. Cobb*, for the demandants.

*S. F. Plimpton*, for the tenant.

SHAW, C. J. This is a real action, to recover a dwelling-house and parcel of land, in Sharon. Both parties claim title, under the will of Ziba Plimpton, the elder, who is admitted to have been seised at the time of his death. This will, dated

and executed in 1821, was admitted to probate, January, 1822. The question depends on the construction of the will. It appears by the facts agreed, that the testator left a widow, two sons and two daughters. The two daughters were provided for by pecuniary legacies, which have no bearing on the present question, except that they, with debts and other legacies, were to be paid by the residuary legatee and devisee personally, and not out of the estate devised. The demandants are the sons and heirs of Daniel Plimpton, one of the sons of the testator, who has deceased; and the tenant holds under a warranty deed from his father, Ziba Plimpton, 2d, the other son of the testator, and the residuary devisee and executor. The clauses of the will affecting this question are as follows: [The chief justice stated the will as on pp. 459, 460.]

The demandants claim that by force of this will, their father, Daniel, took an estate in fee in the house and the acre and a half of land, and that on his decease it descended to them. But the tenant insists, that the devise to Daniel of the house and land, was a life-estate only, for want of the words " heirs and assigns," so that at the death of Daniel, the first taker, this part of the estate fell into the residue, and vested in Ziba Plimpton, 2d, whose estate he holds.

Had this question arisen under a will executed since the adoption of the revised statutes, this question would seem to be settled by its provisions. Rev. Sts. c. 62, § 4. By a general devise of land, all the testator's estate therein shall be held to pass, unless it shall clearly appear by the will, that the devisor intended to convey a less estate. As this law has been in operation since May, 1836, and will apply to all wills made after its passage, this question is not likely often to arise hereafter, and the cases in which it can arise will be constantly diminishing. But, as this will was made before the revised statutes, we are to look to the law as it previously existed, to govern the construction of this will. The law is well settled that in a will, the intent of the devisor, as far as it can be ascertained by the will, is to govern its construction, unless such intention is repugnant to the rules of law, and that every clause and word of the will may be resorted

39 *

to, to ascertain that intention. As the *jus disponendi,* the full and complete power belongs to the testator, to give his real estate to others, either for life or in fee, at his own choice, and as devising the one or the other would violate no rule of law, the question resolves itself wholly into that of intent, and such is the present case.

According to the rule of the common law, a devise of land, or of an estate, where the term " estate " is used as a descriptive designation of land, and not of the devisor's interest in it, without words of limitation to heirs and assigns, would operate, like a similar conveyance *inter vivos,* to pass an estate for life only. But this construction in a devise readily yields to any different intent expressed in the will, and it has been held in a great number of cases, that various expressions and considerations may be resorted to, to find such an intent; it would, therefore, be almost impracticable to review them in detail. The result is, that if, in construing any and every clause in the will, and by a fair interpretation of its terms, the intent of the testator can be discovered, such intent shall be adopted as the true construction.

In looking at this will, we are first to consider the meaning of certain terms and provisions, which are obscure or ambiguous. He first gives to his wife the improvement of his dwelling-house during her life. The gift of the " improvement" of real estate for life, is a gift of the land itself for life. It will be observed, that he gives the dwelling-house only. But such a gift draws with it by necessary implication, though not expressed, the land on which the house stands, with outhouses, front and back yard, and such land as is necessary to its useful and convenient occupation, and commonly used with it.

In the next clause, he gives his son the same dwelling-house after his wife's decease, together with the tract of land described. It is a well-established rule of construction, that when land is devised to one, after the decease of another, especially of a wife or child, such wife or child takes a life-estate by implication, though not otherwise expressed in the will. Here the acre and a half adjoining the house is given

to Daniel, after the decease of the testator's wife; this, taken in connection with the consideration, that he gives his wife no land in terms, not even that upon which the house stands, leads to the conclusion, that the wife was to have the acre and a half, with the house, during her life. Such being the effect of this will, it lays the foundation for the application of another rule of construction, viz: that where land is devised to one for life, and over to another, especially to a son, without words of limitation, or any further words to express his intent, such a devise over is construed to be a fee. The presumption is, that such devise for life to a wife, with a gift over to a son, and without further limitation, was, in the mind of the testator, a final disposition of that part of his estate; and to effect that purpose, it must be a devise of the fee.

Some other parts of this will tend to confirm this conclusion. In the next clause, he gives his son the improvement of two other parcels of land, and adds, " the said Daniel Plimpton to improve the two last described lots of land during his life and then to be equally divided between his two sons." The testator thereby indicates that he makes a distinction between giving his son land, and giving him the improvement of land; and by designating the estate which he intends to give him for his life, " the two last described " lots, he seems to place them in contrast to the house and former lot which he had given him generally. This has some tendency to show a different intent, in the two cases.

It was relied on, in the argument, that as the residuary devisee was charged personally with the debts and legacies, it could not have been the intention of the testator to diminish the residuum so much, as it would do, if the estate for Daniel was a fee, instead of a life-estate. If the question were, whether the residuary devisee, Ziba Plimpton, took a fee in the estate given to him, with such a personal charge, this consideration would have been conclusive that he did. But the argument, that the testator could not have intended to diminish the amount given to Ziba by giving so much to Daniel, equal objects of his bounty, has no weight, without our knowing what was the whole amount which went to the

residuary devisee. For aught that appears in the case, the property of the testator, which went to Ziba under the residuary clause, may have been amply sufficient to pay the debts and legacies, and leave a large surplus.

The result, in the opinion of the court, is, that by this will Daniel took a vested remainder in fee, after the life-estate to Tabitha; that on the death of Daniel, this estate came to his two sons, Shepard and Charles Plimpton, the demandants, by inheritance, and that they are entitled to judgment.

Pursuant to the agreement of the parties, the case will be referred to an assessor, to report to the court the amount of rents and profits, and also the value of all improvements thereon, according to the provisions of Rev. Sts. *c.* 101, unless the parties agree on the adjustment.

At the October term, 1854, the case again came before the court, on the report of Samuel P. Loud, Esq., the assessor, agreed on by the parties and appointed by a rule of court to ascertain the amount of the rents and profits for which the tenant was accountable, and also the value of the improvements made upon the demanded premises, to which the tenant was entitled.

*Cobb,* for the demandants.

*Plimpton,* for the tenant.

SHAW, C. J. 1. It appears by this report, that the assessor's estimate of the improvements was made on the assumption that the tenant was to be allowed for the improvements made by his father, Ziba Plimpton, under whose deed he claims, as well as for his own; and that a considerable part of these improvements were made by the father, in the lifetime of the widow Tabitha Plimpton, who died in 1846. It appears by the agreed statement of facts, that Ziba Plimpton, the residuary devisee, gave a warranty deed to his son, the tenant, about the year 1843, and of course the improvements made by him, were made before that time. It is contended, on the part of the demandants, that the assessor erred in computing anything for improvements, made in the lifetime of the tenant for life; that all improvements, thus made, must have been made

by the widow, or by some one in her behalf and for her benefit and on her account; that it was done by way of repairs and improvements on her own estate, and in this plight came to the remainder-man, who took it at her decease.

This, we believe, is a new question under the betterment acts; and the demandants' view of it would be plausible, if borne out by the facts.[1] But we think it is not. It is agreed, in the original case, that Ziba Plimpton, 2d, father of the tenant, had acquired said Tabitha's right in the residue of her life-estate, before he made the deed to his son in 1843, and, therefore, it is a reasonable presumption that he made the improvements after he had thus acquired such title. Supposing, then, that he believed that as residuary devisee, he would take the estate immediately after her decease, if it had been true that such was his title, he would have been owner of the estate, subject only to such intervening life-estate of Daniel, if he should survive her, and, therefore, having acquired her estate, he would soon be the owner of the fee; and, if so, the conclusion is inevitable, that he made the improvements on his own estate as he believed, and, of course, for his own benefit and at his own expense. The assessor, in a memorandum appended to his report, and made for the information of the counsel, as to his grounds of proceeding, says that there was no evidence, that she, the widow, conveyed her right to Ziba Plimpton and the presumption seems to be, that she simply abandoned the estate, and, therefore, that the true tenant in remainder might have entered, as if she were dead. We think, if the fact were so, this would not be a correct conclusion. We know of no rule, by which a simple abandonment, on the part of the tenant for life, will legally terminate the life-estate, and let in the remainder-man. Nothing, we think, on the part of the life-tenant, can do this, short of some positive act of conveyance or surrender by deed.

---

[1] Note. It does not distinctly appear, when Daniel died, but this part of the case proceeded on the assumption, that if Daniel survived his mother, he never entered, and that the tenant was in possession from the execution of the deed of his father in 1843.

But the case is not open to any such question of fact, because it is agreed, in the statement of facts entered into to govern the case, that Ziba Plimpton, 2d, had acquired the title of the life-tenant, and rightly held it to his own use till his death. The demandants having a remainder only, took their estate in possession at the decease of the tenant for life, and, therefore, the demandants' rents and profits are rightly made to commence at that time. But it is a very different question whether the tenant can claim for improvements made at an anterior period, and it depends on the further question, whether the tenant and the party under whom he claims, has been in the actual and adverse possession of the premises six years before the commencement of the action, or whether, acting in good faith, he made the improvements on the premises, holding them under a title, which he had reason to believe good.

2. If Ziba Plimpton had a conveyance from the widow as tenant for life, then the continued adverse possession had been in him and his son, more than six years before the commencement of the action. He acquired that title during, or previous to the year 1843, and the action was commenced in 1851, he, or his son and grantee under him, holding from and after 1846, the decease of the widow, by right or by wrong, as tenant in fee in remainder in his own right. In order to bring such continued possession within the old statute, and the first provision of the revised statutes, it must be adverse, and not in acknowledgment of, or in subordination to the title of another, nor under any equitable title. *Knox* v. *Hook,* 12 Mass. 329; *Runey* v. *Edmands,* 15 Mass. 291; *Mason* v. *Richards,* 15 Pick. 141; *Larcom* v. *Cheever,* 16 Pick. 260; *Saunders* v. *Robinson,* 7 Met. 310. But, upon the supposition that Ziba Plimpton acquired the title of the widow, some years before her decease, then the possession of himself and his son under her were adverse. When he acquired the title of the widow, he claimed to hold the estate as his own, and, of course, adversely to her, to the devisees in remainder, and to all the world. Whatever may have been the nature of the widow's transfer or surrender of the estate, it does not appear that

she ever after questioned his title or interrupted his possession. Our conclusion is, that the demanded premises had been actually held and possessed by the tenant, and by his father, under whom he claims, for six years before the commencement of the action, and he was entitled by Rev. Sts. *c.* 101, § 19, to recover compensation for improvements, upon the principle stated in section 27, not exceeding the amount actually expended for them, nor shall it exceed the amount to which the value of the premises is actually increased thereby at the time of the assessment.

3. But there is another ground, on which the court are of opinion, that the tenant is entitled to compensation for improvements upon the principles claimed by him.

It is probably true that the original betterment act of 1807, *c.* 75, was suggested by the condition of settlers on wild lands, by squatters without color of title; yet it was soon held that the spirit and the letter of the act were broad enough to include all cases, where persons held by a title, supposed good, but proving defective. *Bacon* v. *Callender,* 6 Mass. 303; *Newhall* v. *Saddler,* 17 Mass. 350; *Heath* v. *Wells,* 5 Pick. 140. But whether the tenant claimed under a naked possession only, where the entry had been made without color of title, or whether, under a supposed good title which proved defective, he could have no compensation for improvements, by the original betterment act, unless the adverse possession had continued six years. This was no doubt a wise provision and consistent with sound policy, when applied to the case of a settler on uncleared land, without pretence of title; but when it came in its practical operation to be applied to the case of one who entered under a title supposed to be good, but afterwards ascertained to be defective, then it was obvious that the equitable right to betterments, on principle, depended on another test than mere lapse of time and holding possession, and that was, whether the tenant or his predecessor had made the improvements, under an actual and honest belief, that he had a good title, and on having reasonable ground for such belief. Accordingly, it was provided by the Rev. Sts. *c.* 101, § 20, that though the adverse possession ha-

not continued **six** years, the tenant should still be allowed for his improvements, if he held under a title, which he had reason to believe good. Since this enlargement of the betterment law, it is considered that the tenant may claim allowance for improvements, if within either category, as having held possession six years, or under a title believed to be good.

In the present case, the court are of opinion that the tenant in this action had very much reason to believe the title under which he held, to be good. He had a warranty deed from his father. His father was the residuary devisee under the will of the acknowledged owner. If Daniel Plimpton had not taken a fee, instead of a life-estate, in this part of the testator's estate, it would have passed to the residuary devisee, and the tenant would have had a perfect title. There was some ground for holding that Daniel did not take a fee, and the tenant may have been honestly so advised by counsel. In *Baggot* v. *Fleming*, 10 Cush. 421, it was held, that the tenant had no reason to believe that he had not a good title, but it is obvious, on looking at the facts, that the tenant did not claim under any title of his own, but simply denied the validity of the demandants' title. But in the case before us, each party claimed upon the strength of his own title ; and which of them had the better title, depended upon the legal construction of a will, which, to say the least, was not free from doubt, until judicially determined. On this ground, therefore, as well as the former, we think the tenant entitled to betterments upon the principles relied on by him ; and the assessor having taken the same view of the relative rights of the parties, and assessed the compensation for improvements, on these principles, his report is accepted, and judgment is to be rendered for the demandants, with allowance to the tenant for betterments in conformity with the report.